# EXHIBIT A

**IN THE 262ND JUDICIAL DISTRICT**
**HARRIS COUNTY, TEXAS**

**IN THE COURT OF CRIMINAL APPEALS**
**OF TEXAS IN AUSTIN, TEXAS**

| | | |
|---|---|---|
| | ) | |
| | ) | |
| **EX PARTE LARRY ESTRADA** | ) | **CAUSE NO.** |
| | ) | |
| | ) | **TRIAL COURT CASE NO. 746585** |
| | ) | |

<u>**SUCCESSIVE APPLICATION FOR POST-CONVICTION WRIT OF HABEAS CORPUS**</u>

**THIS IS A DEATH PENALTY CASE**

**TABLE OF CONTENTS**

I.     PROCEDURAL HISTORY.................................................................... 1

II.    INTRODUCTION ............................................................................... 3

       A.    The Jury Could Not Answer the Question, "Who Fired the Fatal Bullet?" 3

       B.    Mr. Estrada's Intellectual Disability ............................................ 5

III.   MR. ESTRADA'S EXECUTION WOULD VIOLATE THE EIGHTH
       AND FOURTEENTH AMENDMENTS BECAUSE HE IS
       INTELLECTUALLY DISABLED.................................................... 6

       A.    Standard for assessing intellectual disability ........................... 6

             1.    Prong one: deficits in intellectual functioning .............. 7

             2.    Prong two: deficits in adaptive functioning ................... 8

             3.    Prong three: onset during the developmental period ........... 10

             4.    Exposure to risk factors ....................................... 10

       B.    Larry Estrada Is Intellectually Disabled. .................................. 11

             1.    Mr. Estrada has significant limitations in intellectual
                   functioning. ................................................... 11

             2.    Mr. Estrada has significant limitations in adaptive behavior,
                   as expressed in conceptual, social, and practical adaptive
                   skills. ....................................................... 15

                   a)    Conceptual Domain ....................................... 17

                         1)    Academic Skills Tests............................ 17

                   b)    Practical Domain......................................... 19

                   c)    Social Domain............................................ 19

             3.    Mr. Estrada's disability originated during the
                   developmental period........................................... 20

                   a)    Evidence of Developmental Onset.......................... 20

                   b)    Risk Factors for Intellectual Disability ................ 21

       C.    Conclusion ......................................................... 21

IV.    MR. ESTRADA'S DEATH SENTENCE VIOLATES DUE PROCESS
       BECAUSE THE STATE WITHHELD MATERIAL EVIDENCE IN
       VIOLATION OF *BRADY*. ................................................... 22

       A.    Standard for Assessing *Brady* Claims.................................. 22

       B.    Evidence That Mr. Estrada Did Not Kill the Decedent Would Have Been
             Material to His Sentencing............................................ 25

C.     This Favorable Evidence Was Withheld and Was Unavailable to Estrada's Original Habeas Counsel ........................................................................ 30

D.     Conclusion ............................................................................................... 31

V.     PRAYER FOR RELIEF ..................................................................................... 31

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Armstrong v. State*,
  897 S.W.2d 361 (Tex. Crim. App. 1995).............................................................................23

*Atkins v. Virginia*,
  536 U.S. 304 (2002)..............................................................................................................6, 10

*Berger v. United States*,
  295 U.S. 78 (1935)...................................................................................................................23

*Blackmon v. Scott*,
  22 F.3d 560 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994)...............................................23, 24

*Brady v. Maryland*,
  373 U.S. 83 (1963)........................................................................................................ *passim*

*Brumfield v. Cain*, 135 S. Ct. 2269, 2281 (2015). .......................................................................15

*Giglio v. United States*,
  405 U.S. 150 (1972).................................................................................................................23

*Hall v. Florida*,
  134 S. Ct. 1986 (2014)...................................................................................................6, 7, 8, 10

*Hinton v. Alabama*,
  571 U.S. 263 (2014).................................................................................................................24

*Kyles v. Whitley*,
  514 U.S. 419 (1995)............................................................................................................23, 24

*McNally v. Guevara*,
  52 S.W.3d 195, 195 (Tex. 2001).................................................................................................2

*Ex Parte Miles*,
  359 S.W.3d 647 (Tex. Crim. App. 2012)....................................................................................23

*Moore v. Texas*,
  137 S. Ct. 1039 (2017)...................................................................................................... *passim*

*Thomas v. Allen*,
  607 F.3d 749 (11th Cir. 2010) ................................................................................................8, 14

*Thomas v. State*,
  2018 WL 6332526 (2018)............................................................................................................6

*United States v. Bagley*,
   473 U.S. 667 (1985)..........................................................................................23, 24

## EXHIBIT INDEX

Exhibit 1          Dr. Antonio E. Puente's Neuropsychological Evaluation

Exhibit 2          Texas Department of Criminal Justice Records

Exhibit 3          Dr. John M. Fabian's Intellectual Functioning Evaluation

Exhibit 4          Educational Records from Spring Independent School District

Exhibit 5          Northbrook High School Records

Exhibit 6          Affidavit of Patricia Pace

Exhibit 7          HPD Report of Officer Cates

Exhibit 8          HPD Supplement Report from C.E. Anderson

Exhibit 9          HPD Firearms Report

Exhibit 10         HPD Witness Statements

Exhibit 11         HPD Interview with Mauro Ortiz

Exhibit 12         Affidavit of Gerard Guerinot

Exhibit 13         Affidavit of Juana Estrada (English and Spanish)

Exhibit 14         Affidavit of Claudia Gutierrez (English and Spanish)

Exhibit 15         Affidavit of Andrew Deleon, Jr. (English)

Exhibit 16         Affidavit of Belinda Tovar (English)

Exhibit 17         Affidavit of Bernardo Estrada (English)

Exhibit 18         Affidavit of Cipriano OCampo  (Spanish)

Exhibit 19         Affidavit of Elvia Carrillo (English)

Exhibit 20         Affidavit of Flora Estrada  (English and Spanish)

Exhibit 21         Affidavit of Helen Rodriquez (English)

Exhibit 22         Affidavit of Mario Estrada (English and Spanish)

Exhibit 23          Affidavit of Maurino Estrada (English and Spanish )

Exhibit 24          Affidavit of Michael Hamling (English)

Exhibit 25          Affidavit of Sergio Estrada (English)

Exhibit 26          Affidavit of Teresa OCampo (English and Spanish)

## I.    PROCEDURAL HISTORY

Mr. Estrada was charged with murder resulting from an armed robbery which occurred on February 21, 1997. (Clerk's Record 0003, Indictment No. 746585.)

He was found guilty on February 18, 1998. (Trial Tr. Vol. 21, at 40.)  He was sentenced to death on February 23, 1998. (Trial Tr. Vol. 24, at 53)

On September 15, 1999, in an unpublished opinion, the Court of Criminal Appeals affirmed his conviction and sentence. (*Estrada v. Texas*, No. 73,054, slip op. at 16.)

His conviction and sentence became final when the United States Supreme Court denied his petition for a writ of certiori on October 10, 2000. (*Estrada v. Texas*, 531 U.S. 828 (2000).)

The Court of Criminal Appeals denied Mr. Estrada's initial application for post-conviction relief on October 9, 2002. (*Estrada v. Dretke, et al.*, No. 4:03-cv-03660, Dkt. 1 (S.D. Tex.).)

On October 30, 2002, Mr. Estrada filed a Motion for Appointment of Counsel in federal court. (Dkt. 1)

On December 30, 2002 Charles Kelley, of the Houston office of Mayer Brown LLP (f/k/a Mayer, Brown, Rowe & Mawe, LLP), was appointed as counsel for Mr. Estrada to investigate and file an application for a federal writ of habeas corpus. (*Id.,* Dkt. 3.)

On September 11, 2003, with the agreement of the State, a "skeletal" petition setting forth Mr. Estrada's potential claims by the deadlines set forth under the Antiterrorism and Effective Death Penalty Act was filed. (*Id.*, Dkt. 6.) On September 26, 2003, Judge Hughes entered an Order permitting the filing of a "skeletal petition." (Dkt. 7.)

Mr. Estrada's amended habeas petition was originally due on December 11, 2003. However, due to delays in receiving information from various governmental authorities with respect to counsel's investigation of Mr. Estrada's habeas claims, the Court granted counsel

1

additional time to file the amended habeas petition.  An extension was granted on September 20, 2004.  The amended habeas petition was due to be filed by January 20, 2005. (*Id.*, Dkt. 17.)

In order to obtain documents and materials from the Houston Police Department necessary to complete the investigations to support the amended habeas petition, counsel sent several requests to the department under the Texas Public Information Act (formerly known as the Texas Open Records Act).  However, the city failed to comply with its obligations under the Texas Public Information Act in responding to almost all of these requests.  On May 4, 2004, counsel filed a mandamus action, *Estrada et. al. vs. City of Houston*, No. 2004-23665 (129th Judicial Dist., Harris County, Texas).

Thereafter because of the pendency of the mandamus action, four Orders were entered by Judge Hughes extending the period to file an amended habeas petition. (*Estrada v. Dretke, et al.*, No. 4:03-cv-03660, Dkt. 17, 21, 23, 25.)  On May 16, 2005, the habeas action was transferred to Judge Gray H. Miller. (*Id.*, Dkt. 26.)  On August 1, 2005 Judge Miller entered an Order Staying and Administratively Closing the habeas action.  The Order stated that "Petitioner will promptly file a motion to reopen the proceeding when his state court litigation concludes." [1] (*Id.*, Dkt. 28.)

On November 21, 2017, Judge Miller ordered Counsel to file an Advisory with respect to the status of the State Court litigation. (*Id.*, Dkt. 30.)  On December 1, 2017, counsel filed papers complying with Judge Miller's Order. (*Id.*, Dkt. 31, 32, 33.)  On March 18, 2019, Judge Miller recused himself.  (*Id.*, Dkt. 34.) The case was re-assigned to Judge Hoyt.  On May 2, 2019, Judge Hoyt entered an Order that within ten days Mr. Estrada had to describe:

---

[1] The State litigation still has not concluded.  The merits have been concluded but the issue of attorney's fees have not been resolved.  While counsel have sought unsuccessfully to settle the matter, the City has refused.  The merits ruling will be appealed because counsel believes that all of the "Brady" material has not been supplied to the defense.  Under Texas law the merits ruling cannot be appealed until all the issues, including attorney's fees have been resolved. *See McNally v. Guevara*, 52 S.W.3d 195, 195 (Tex. 2001) (explaining that trial court's summary judgment ruling is not appealable while attorneys' fees issue remains pending).

1) the status of any on-going state civil litigation.

2) what efforts Estrada has made since his 2017 Advisory to expedite the mandamus litigation;

3) what efforts, whether related to the mandamus litigation or otherwise, Estrada has made to challenge his conviction and sentence since this case was stayed in 2006;

4) any circumstances that would discourage either reopening of this federal habeas or dismissal of his federal habeas petition.

(*Id.*, Dkt. 36.)

On May 12, 2019, Estrada filed the Advisory. (*Id.*, Dkt. 37.) On May 22, 2019, the State responded by asking the Court to vacate the stay and reopen federal habeas proceedings. (*Id.*, Dkt. 39.) On June 12, 2019, Estrada filed his response to the State's filing. (*Id.*, Dkt. 40.)

On September 11, 2019, Judge Hoyt entered an order that "Estrada file an updated Advisory within sixty (60) days from the entry of this Order. The Court will reopen this case at that time Estrada is not actively litigating a post-conviction challenge to his conviction and sentence." (*Id.*, Dkt. 41.) On November 13, 2019, on an unopposed motion, Judge Hoyt ordered "that [the] deadline for Estrada to file a post-conviction challenge to his capital conviction and sentence is extended to, and including, December 12, 2019. Estrada will file an updated advisory on that date which will include a copy of any state-court filings." (*Id.*, Dkt. 44.)

This filing complies with the Orders of the Federal District Court for the Southern District of Texas entered on September 11 and November 13, 2019.

## II. INTRODUCTION

### A. The Jury Could Not Answer the Question, "Who Fired the Fatal Bullet?"

Just thirty-nine (39) days after he turned eighteen, Larry Estrada joined Mauro Ortiz in committing a robbery which led to the death of Georges Elkrab. Mr. Estrada was tried before a jury and received the death penalty. Mauro Ortiz, who was older than Mr. Estrada, pled guilty and received a life sentence.

There was no doubt that Mr. Estrada and Mr. Ortiz committed the armed robbery. But there was grave doubt about which of them fired the gunshot which killed Mr. Elkrab. The other people in the store during the armed robbery, employee Menaf Khudari and customers Martin Cook and Paul Scott, were unable to say who shot the decedent.

Mr. Estrada and Mr. Ortiz were each armed with a handgun. One of them had a .380, which was the murder weapon, and the other had a 9 millimeter. When Mr. Estrada was arrested about four months after the armed robbery, he readily admitted his participation. Mr. Estrada consistently stated that he had possessed the 9 millimeter pistol and that he did not kill Mr. Elkrab. The coroner testified that the bullets removed from Mr. Elkrab's body came from a .380 handgun.

When Martin Cook entered the store, Mr. Ortiz told him to lie down. Mr. Ortiz then fired his handgun into a television monitor that was displaying the video feed from a surveillance camera. A spent bullet was recovered by a crime scene investigator, Officer Cates, from the back of the TV monitor and sent to the crime lab for examination. The ballistics expert, Mr. Anderson, testified that this spent bullet came from a .380-caliber handgun, but he was unable to identify it as the bullet recovered from the TV monitor. The .380-caliber handgun itself was never recovered. Mr. Ortiz's apartment was searched, and eight live .380 rounds were found there.

In light of a parties instruction given to the jury, the question of who carried the .380 was not dispositive of guilt or innocence; however, as a highly material circumstance of the offense, it was relevant during the sentencing phase of the trial, as to both the future dangerousness special issue and the mitigation special issue. The jury was actively considering this circumstance while deliberating sentence, as shown by the note sent to the court during deliberations identifying a "statement in dispute," specifically, the "caliber of the bullet found in the television." (Trial Tr. Vol. 24 at 49:20-21.) The Houston Police Department had evidence that resolves the doubts about

which bullet was found in the television and demonstrates it was Mr. Ortiz, not Mr. Estrada, who was wielding the murder weapon. That evidence was withheld from Mr. Estrada's trial counsel, depriving Mr. Estrada of his due process rights at sentencing.

### B.    Mr. Estrada's Intellectual Disability

At the time of Mr. Estrada's trial, neither youth nor intellectual disability barred the imposition of a death sentence. The later bar, prohibiting the execution of one who commits murder before age 18, would not have helped Mr. Estrada because he committed the armed robbery just weeks after turning 18. But intellectual disability now bars the imposition of the death penalty, and the evidence shows that Mr. Estrada is a person with intellectual disability.

When Mr. Estrada was tried, a diagnosis of intellectual disability was relevant as general mitigation evidence. Nevertheless, despite the presence of numerous red flags signaling Mr. Estrada's potential disability, his trial counsel introduced not one iota of evidence during the mitigation phase regarding Mr. Estrada's functioning. This gross omission permitted one of the prosecutors to argue at closing that while in some cases the fact that a defendant was "retarded or handicapped" might warrant mercy, the jurors had heard nothing so "extraordinary" about Mr. Estrada. (Trial Tr. Vol. 24 at 15).

That evidence has now been developed, however, and it shows precisely such an "extraordinary" circumstance: Mr. Estrada is a person with intellectual disability. These are the findings of Dr. Antonio Puente, a richly qualified expert who has submitted a lengthy report detailing his conclusions. Dr. Puente found that Mr. Estrada's IQ range falls within the range indicating significant limitations in intellectual functioning, including a full scale IQ score of 74, a short form WAIS-R score of 76, and numerous Texas Department Criminal Justice IQ reports noting that his IQ is under 73. Further, Dr. Puente confirms that Mr. Estrada also has significant

limitations in all three domains of adaptive functioning: conceptual, social and practical, and that his intellectual and adaptive deficits originated before age 18.

Under *Atkins*, the Eighth Amendment bars Mr. Estrada's execution.

III.    **MR. ESTRADA'S EXECUTION WOULD VIOLATE THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE HE IS INTELLECTUALLY DISABLED**

A.      **Standard for assessing intellectual disability**

In *Atkins*, the Supreme Court held that the Eighth Amendment ban on cruel and unusual punishment categorically prohibits the execution of intellectually disabled individuals. *Atkins v. Virginia*, 536 U.S. 304, 307 (2002). Although the Court allowed the States some latitude in developing appropriate ways to enforce this categorical exemption, it "did not give [them] unfettered discretion." *Hall v. Florida*, 134 S. Ct. 1986, 1998 (2014). Rather, the assessment of an intellectual disability claim must be informed by the opinions of the medical community. *Id.* at 1993, 1998. The most recent and current opinions of the medical community are found in *the Fifth Edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") and the *Eleventh Edition of the American Association on Intellectual and Developmental Disabilities' Intellectual Disability: Definition, Classification, and Systems of Supports* ("AAIDD Manual"). *Moore v. Texas*, 137 S. Ct. 1039, 1048 (2017); see also *Thomas v. State*, No. AP-77,047, 2018 WL 6332526, at *4 (Tex. Crim. App. Dec. 5, 2018).

To prove intellectual disability, a defendant must establish by a preponderance of the evidence: (1) significantly sub-average intellectual functioning, (2) deficits in adaptive functioning, and (3) the onset of deficits during the developmental period. *See Hall,* 134 S. Ct. at 1994; *DSM-5* at 33; *AAIDD Manual* at 5.

### 1.    Prong one: deficits in intellectual functioning

The first prong that an individual must meet for an intellectual disability diagnosis is deficits in intellectual functioning, such as reasoning, problem solving, planning, abstract thinking, judgment, academic learning, and learning from experience. *DSM-5* at 33; *AAIDD Manual* at 31. These are typically measured through an IQ test, which identifies an individual's intellectual functioning in relation to the average intellectual functioning for the general population. An intellectually disabled individual will generally have an IQ that falls approximately two standard deviations below the population mean. Most IQ tests are constructed so that the mean is set at 100 with a standard deviation of 15 points.

Because there is statistical error and uncertainty in any assessment of human behavior, intellectual functioning is best represented by a score range, rather than a single score. *DSM-5* at 37; *AAIDD Manual* at 35, 41-42. *Hall* requires courts to take into account a standard error of measurement of 5 points above and below the full scale IQ score. *See* 134 S. Ct. at 2001 ("But in using these scores to assess a defendant's eligibility for the death penalty, a State must afford these test scores the same studied skepticism that those who design and use the tests do, and understand that an IQ test score represents a range rather than a fixed number."). Consequently, applying the standard error of measurement, a score of approximately 75 or below qualifies for an intellectual disabled diagnosis.

The intellectual functioning criteria in both authoritative sources, the AAIDD Manual and DSM-5, are similar. Both establish a criterion of an IQ score *approximately* two standard deviations below the population mean, which is an IQ of 70, and acknowledge the standard error of measurement as 5 points, resulting in an approximate IQ range of 65-75 for diagnostic purposes.

Both sources also recognize the Flynn Effect.[2] The Flynn Effect observes that IQ scores rise over time. AAIDD User's Guide (2007); *see also AAIDD Manual*, at 37; *DSM-5*, at 37; *Thomas v. Allen*, 607 F.3d 749, 753 (11th Cir. 2010). "[A]s an intelligence test ages, or moves farther from the date on which it was standardized, or normed, the mean score of the population as a whole on that assessment instrument increases, thereby artificially inflating the IQ scores of individual test subjects." 607 F.3d at 753. Accordingly, "IQ test scores must be recalibrated" to take into consideration the Flynn Effect. *Id*. An IQ score should be adjusted roughly 0.33 points per year from the date the instrument was normed to the date it was administered. *AAIDD Manual*, at 37-38; AAMR, User's Guide: Mental Retardation Definition, Classification and Systems of Supports 20 (10th ed. 2007). And the AAIDD Manual explicitly recommends IQ scale score corrections for norms that are out of date. *AAIDD Manual* at 37. In addition to IQ scores, a clinician should consider neuropsychological test results and evidence of academic achievement that may provide additional insight into an individual's intellectual functioning. *See DSM-5* at 37.

Once an individual has established a qualifying IQ score within the range of approximately 75 or below, a court must move on to consider adaptive deficits. *Moore*, 137 S. Ct. at 1049 (citing *Hall*, 134 S. Ct. at 2001).

## 2.      Prong two: deficits in adaptive functioning

The second prong that an individual must meet for an intellectual disability diagnosis is deficits in adaptive functioning, which measure how well the individual meets community

---

[2]      *See DSM-5* at 37 ("Factors that may affect test scores include practice effects and the 'Flynn effect' (i.e., overly high scores due to out-of-date test norms"); *see also* Edward A. Polloway, The Death Penalty and Intellectual Disability, Chapter 10, *Norm Obsolescence: The Flynn Effect* (published by the AAIDD) ("As a result of the Flynn Effect, it is possible that one or more IQ test scores reported for an individual being considered for a diagnosis of intellectual disability (ID) may be inaccurate and inflated estimates. Given the high-stakes nature of Atkins, ID cases and their tendency to artificially focus on specific "bright line" cutoff scores, the impact of the Flynn effect must be recognized and an adjustment to the inflated scores is recommended.").

standards of personal independence and social responsibility when compared to other people of similar age and sociocultural background. *DSM-5* at 33; *AAIDD Manual* at 43.

The DSM-5 measures adaptive functioning over three domains: conceptual, social, and practical. The conceptual, or academic, domain involves competence in memory, language, reading, writing, math reasoning, acquiring practical knowledge, problem solving, and judgment in novel situations, among others. The social domain involves awareness of others' thoughts, feelings, and experiences; empathy; interpersonal communication skills; friendship abilities; and social judgment, among others. The practical domain involves learning and self-management of behavior, and school and work task organization, among others. *DSM-5* at 37.

Under the DSM-5, adaptive deficits must be related to the deficits in intellectual functioning identified for prong one. *DSM-5* at 38. In assessing whether an individual's adaptive deficits are related to his deficits in intellectual functioning, the clinician must still keep in mind the various risk factors for intellectual disability and consider that "[c]o-occurring mental, neurodevelopmental, medical, and physical conditions are frequent in intellectual disability, with rates of some conditions . . . three to four times higher than in the general population." *DSM-5* at 40. Neither the presence of certain risk factors nor the comorbidity of intellectual disability with other disorders should be interpreted to undermine the relationship between an individual's deficits in intellectual functioning and adaptive behavior. *Id.; see Moore,* 137 S. Ct. at 1050 ("The existence of a personality disorder or mental-health issue, in short, is 'not evidence that a person does not also have intellectual disability.") (internal citation omitted).

The AAIDD Manual notes that adaptive functioning must be assessed on the basis of a person's typical performance, not the best of which they might sometimes be capable. *AAIDD Manual*, at 47. Similarly, the AAIDD Manual is clear that a person with intellectual disability may

display adaptive strength and warns that these strengths do not negate the presence of adaptive deficits. *Id.* at 47. The focus of prong two is on adaptive deficits. *Moore,* 137 S. Ct. at 1050.

Both the DSM-5 and the AAIDD Manual require deficits or significant limitations in only one of the three adaptive functioning domains—conceptual, social, and practical—to make a diagnosis of intellectual disability. *DSM-5* at 38; *AAIDD Manual* at 46.

### 3.    Prong three: onset during the developmental period

The third prong that an individual must meet is onset of deficits during the developmental period, which is defined as before the age of 18. Neither the DSM-5 nor the AAIDD Manual require that the deficits be present at birth or even be biomedical in nature. An individual's intellectual disability may be the result of a genetic disorder, traumatic brain injury, psychosocial stressors, or any number of other causes. *See AAIDD Manual* at 58-62. The question is not the cause of the deficits, but whether they existed during the developmental period.

### 4.    Exposure to risk factors

Exposure to certain risk factors may increase the likelihood of intellectual disability. AAIDD Manual at 59. Risk factors known to be linked to the development of intellectual disability include social risk factors, such as impaired child-caregiver interactions or family poverty; behavioral risk factors, such as child abuse and neglect, inadequate safety measures or domestic violence; educational risk factors, such as impaired parenting, inadequate special education services or inadequate family support; and biomedical risk factors. *Id.* at 60. Exposure to any of these factors may contribute to the development of intellectual disability. *Id.* Exposure to risk factors is not a diagnostic criterion for intellectual disability, but their presence corroborates evidence reflecting that a person may be intellectually disabled in the context of an *Atkins* determination. *Moore,* 13 7 S. Ct. at 1051; *see also Hall,* 134 S. Ct. at 1991 ("Hall's upbringing appears to make his deficits in adaptive functioning all the more severe.").

**B.    Larry Estrada Is Intellectually Disabled.**

Mr. Estrada has been diagnosed as a person with intellectual disability.[3] Mr. Estrada has experienced significant limitations in intellectual functioning and adaptive behavior that began at an early age, during the developmental period. As explained both by Dr. Puente's report and historical records, Mr. Estrada's IQ falls within the range of intellectual disability as defined by the AAIDD Manual and DSM-5. His adaptive functioning is impaired in all three domains. Finally, these intellectual and adaptive impairments originated in childhood. Therefore, Mr. Estrada is intellectually disabled and may not, consistent with the Eighth Amendment, be subject to the death penalty. Mr. Estrada's satisfaction of each individual prong is discussed in detail, and supported by evidentiary proffers, below.

**1.    Mr. Estrada has significant limitations in intellectual functioning.**

Many of the available IQ data points for Mr. Estrada are his Texas Department of Criminal Justice (hereafter "TDCJ") records, which contain a total of seven distinct IQ classifications that span six years. Mr. Estrada's school records do not contain any IQ scores, nor did Mr. Estrada's trial counsel attempt to have his 18-year-old client tested prior to trial. The earliest TDCJ reference to Mr. Estrada's IQ appears on a Service Investigation Work Sheet dated April 28, 1999, when Mr. Estrada was 20 years old.[4] This record notes the TDCJ classified Mr. Estrada as having an IQ below 73 and an educational achievement[5] below 5.0.[6] Educational achievement indicates the grade level at which Mr. Estrada is functioning. Here, a score below 5.0 indicates Mr. Estrada is functioning at the outset of the fifth grade. "It is important to keep in mind that even those

---

[3]       *See* Dr. Antonio E. Puente's Neuropsychological Evaluation (hereafter "Dr. Puente Report"), attached as Ex. 1.
[4]       Mr. Estrada was born on January 13, 1979.
[5]       Educational achievement (EA) is calculated using the Test of Adult Basic Education.
[6]       Ex. 2A, Texas Department of Criminal Justice Records (Bates Stamp 001072).

diagnosed with 'Mild Intellectual Disability' appear similar to unaffected individuals and often blend into the general population. (Approximately 85% of those with I.D.) Many achieve academic skills at the sixth grade level or higher and some graduate from high school. As adults, many individuals hold jobs, marry and raise families yet at times may appear slow or need extra help negotiating life's problems and tasks." Comprehensive Textbook of Psychiatry, at 3496, Kaplan & Sadock, Tenth Edition (2017).

In addition to Mr. Estrada's 1999 IQ score from TDCJ, the TDCJ also indicated that Mr. Estrada had an IQ below 73 and an educational achievement below 5.0 on six other reports: October 19, 1999;[7] November 17, 2000;[8] November 27, 2001;[9] December 13, 2001;[10] March 14, 2003;[11] and July 22, 2005.[12] Additionally, Service Investigation Work Sheets described Mr. Estrada's literacy as "questionable" on three of those occasions: November 17, 2000;[13] March 14, 2003;[14] and July 22, 2005.[15]

In 1998, Dr. Gilhousen, a psychologist at TDCJ, administered a short form WAIS-R to Mr. Estrada.[16] This test measured Mr. Estrada's IQ as 76.[17] Although this score is one point above the 65-75 IQ range indicating significant intellectual impairment, the test record is not available and cannot, therefore, be examined for scoring accuracy. The brief notes provided by Dr. Gilhousen do not specify the conditions under which the short form test was administered, his scores on

---

[7]    Ex. 2B, Texas Department of Criminal Justice Records (Bates Stamp 001065).
[8]    Ex. 2C, Texas Department of Criminal Justice Records (Bates Stamp 001043).
[9]    Ex. 2D, Texas Department of Criminal Justice Records (Bates Stamp 000995).
[10]   Ex. 2E, Texas Department of Criminal Justice Records (Bates Stamp 000983).
[11]   Ex. 2F, Texas Department of Criminal Justice Records (Bates Stamp 001091).
[12]   Ex. 2G, Texas Department of Criminal Justice Records (Bates Stamp LE004130).
[13]   Ex. 2C, Texas Department of Criminal Justice Records (Bates Stamp 001043).
[14]   Ex. 2F, Texas Department of Criminal Justice Records (Bates Stamp 001091).
[15]   Ex. 2G, Texas Department of Criminal Justice Records (Bates Stamp LE004130).
[16]   Ex. 2H, Clinic Notes, Texas Department of Criminal Justice (Bates Stamp 001284).
[17]   Id.

individual subtests, or whether he applied the Flynn Effect in calculating the full scale IQ. Moreover, given that the TDCJ classified Mr. Estrada as having an IQ less than 73 after he had been tested by Dr. Gilhousen suggests that the score was overstated, and short form tests are known to have a tendency towards inflating IQ scores.[18]

On March 1, 2017, Dr. John Fabian assessed Mr. Estrada's intellectual functioning. Utilizing the Stanford-Binet Intelligence Scales – 5 (SB5), Dr. Fabian concluded "with a reasonable degree of psychological and neuropsychological certainty that Mr. Estrada's IQ of 74 and 4th percentile is within the intellectually disabled range."[19] Dr. Fabian further concluded that "when considering an adjusted IQ score based on the Flynn effect his IQ score would be approximately $69 \pm 5$.[20]

On September 29, 2017, Dr. Antonio Puente, a nationally renowned expert in cross-cultural neuropsychological evaluations and former President of the American Psychological Association, examined Mr. Estrada. He performed a battery of neuropsychological tests focused on his intellectual and academic abilities. The results of Dr. Puente's examination further support the scores noted in Mr. Estrada's TDCJ records and obtained by Dr. Fabian. Dr. Puente administered The Comprehensive Test of Non-Verbal Intelligence, 2nd Edition (CTONI-2) in order to obtain a measure of intellectual ability. IQ score. The test results "yielded a Full-Scale score of 73 or in the third percentile, suggesting that this individual is functioning at the borderline to impaired range."[21]

---

[18]     Joy H. Wymer, Katrina Rayls, and Mark T. Wagner, "Utility of a clinically derived abbreviated form of the WAIS-III," 18 Archives of Clinical Neuropsychology 917, 919 (2003) (noting that a very widely used two-subtest abbreviation of the WAIS-III may overestimate the subject's IQ).

[19]     Dr. John M. Fabian's Intellectual Functioning Evaluation (hereafter "Dr. Fabian Report") is attached as Ex. 3.

[20]     *Id.*

[21]     Dr. Puente Report, at 5.

Dr. Puente also administered The Wide Range Achievement Test, Fifth Edition (WRAT 5) in English, and determined that "Mr. Estrada's abilities in Word Reading were in the 12th percentile and equivalent to a sixth-grade level. His math abilities were in the fifth percentile and equivalent to a fourth-grade level. In summary, his academic abilities are between the fourth and sixth grade and between the fifth and twelfth percentile."[22]

Mr. Estrada was raised in homes with many primarily Spanish speaking relatives. In order to determine whether there might be differences in Mr. Estrada's functioning in Spanish, Dr. Puente administered Portions of the Woodcock Munoz Language Survey Revised (Spanish). According to Dr. Puente, "Mr. Estrada's academic abilities in Spanish as measured by subtests Vocabulario was equivalent to 4.2 years of education and 11 years of age. Analogia Verbales yielded an educational equivalent of 2.3 and an age equivalent of 7 years of age. Hence, his vocabulary was better than his understanding of verbal analogies. Overall, whether his academic abilities were measured in Spanish or in English, his performance is in the low range of functioning".[23]

Mr. Estrada's available IQ scores are clustered between 73 and 76, with most of his scores being below 75.[24]   Moreover, as explained in detail below, Mr. Estrada's academic tests

---

[22]     *Id.* at 8.
[23]     Dr. Puente Report, at 8.
[24]     The AAIDD Manual emphasizes that its definition of significant limitations in intellectual functioning "*does not* intend for a fixed cutoff point to be established for making the diagnosis of [intellectual disability]," and is intended "to reflect a clinical judgment rather than an actuarial determination." The AAIDD definition itself uses the word "approximately" to modify the measurement of two standard deviations, "reflect[ing] the role of clinical judgment in weighing the factors that contribute to the validity and precision of a decision" and "address[ing] statistical error and uncertainty inherent in any assessment of human behavior." IQ scores above 75 do not disqualify individuals from an intellectual disability diagnosis, nor from a legal finding of intellectual disability under Atkins. *AAIDD Manual*, at 39-40*; see Thomas v. Allen*, 607 F.3d at 757. The court in Thomas v. Allen rejected an argument based on the presence of an IQ score of 77 (among other, lower scores), even under pre-Hall law.

corroborate the IQ scores. Accordingly, he has significantly sub-average deficits and his adaptive functioning must be considered.

### 2. Mr. Estrada has significant limitations in adaptive behavior, as expressed in conceptual, social, and practical adaptive skills.

Mr. Estrada's intellectual limitations described above were not restricted to taking formal tests; they also impacted real life situations such as maintaining and advancing in employment, making social judgments about the intentions of others, and predicting the consequences of his actions. In other words, Mr. Estrada's intellectual limitations resulted in adaptive behavior deficits. Without support, Mr. Estrada was frequently unable to overcome many of the challenges resulting from these deficits, diminishing his ability to successfully function in everyday life.

This everyday functioning is at the heart of the second prong of intellectual disability, defined by the AAIDD Manual as significant limitations in adaptive behavior as expressed in conceptual, social, and practical skills.[25] An intellectual disability diagnosis only requires significant limitations in one of these domains. Persons with intellectual disability typically show both strengths and limitations in adaptive behaviors. The presence of relative strengths in some spheres of behavior is not evidence that a person does not have intellectual disability. *AAIDD Manual*, at 45 ("adaptive skill limitations often coexist with strengths"); *see also Brumfield v. Cain*, 135 S. Ct. 2269, 2281 (2015). Thus, no single weakness or strength is sufficient to establish or undermine a global conclusion that the individual has significant limitations in adaptive behavior.

Mr. Estrada experiences impairments in all three domains, particularly in the social domain.[26] As detailed in Dr. Puente's report:

---

[25]    *AAIDD Manual*, at 1.
[26]    *Id.* at 47.

> Mr. Estrada appears to have deficits in all areas of adaptive abilities. Socialization, Communication and Daily Living Skills scores are overall in the Severe Deficit Range, indicating difficulty expressing his needs to others and understanding what other people require of him, and trouble understanding social interactions or what is appropriate within the boundaries of a specific relationship.[27]

In addition to face-to-face collateral interviews with witnesses who were familiar with Mr. Estrada throughout the developmental period,[28] Dr. Puente administered The Vineland Adaptive Behavior Scale ("Vineland") to: Andrew Deleon, Jr., a friend of Mr. Estrada's between ages 13-16; Patricia Pace, Mr. Estrada's Kindergarten and first grade teacher; Sergio Antonio Estrada, Mr. Estrada's maternal cousin; and Claudia Gutierrez, Mr. Estrada's maternal aunt who has known him throughout his life and was his primary caretaker for a year when he resided with her in Mexico.

The Vineland is an individually administered measure of adaptive behavior that takes into account information from those who are familiar with the individual's daily functioning. The use of standardized instruments of adaptive behavior scales has greatly improved the diagnosis of intellectual disability.[29] The Vineland is one of "three tests that meet contemporary standards for standardization, reliability, and validity".[30]

Dr. Puente concluded that Mr. Estrada's adaptive functioning is significantly impaired.[31] Through a qualitative data review, which included in-person interviews and a review of affidavits, Mr. Estrada's exhibited impairments in cognitive and practical domains. The quantitative review conducted by Dr. Puente further substantiated significant impairment across all three sub-categories of adaptive functional abilities. Based upon the qualitative and quantitative review, Dr. Puente found that Mr.

---

[27]     Ex. 1, Dr. Puente Report, at 19.
[28]     In addition to those with whom Dr. Puente administered the Vineland Adaptive Behavior Scales, he also interviewed Helen Rodriguez, a family friend and Mr. Estrada's mother, Juana Estrada.
[29]     Amicus brief in *Moore* from APA
[30]     *Id.* at 12
[31]     Ex. 1, Dr. Puente Report.

Estrada's adaptive functioning is impaired in all three domains and thus satisfies prong two of the intellectual disability diagnosis.

### a)    Conceptual Domain

Mr. Estrada's conceptual functioning deficits were indicated by prior teachers, family members, friends, and neighbors.[32] Collateral sources noted that Mr. Estrada was unable to read and could not comprehend sentences. Some recalled that, even though Spanish was the primary language spoken in Mr. Estrada's childhood home, he was unable to engage in meaningful conversation in Spanish. Mr. Estrada had difficulty counting money, budgeting, and often required assistance in order to pay bills. Although Mr. Estrada worked low level jobs, such as being a busboy, where he was able to engage in simple tasks, he was unable to make decisions on his own and could not problem-solve. Dr. Puente indicates that this is partially due to Mr. Estrada's rigid thinking and inability to engage in forward-thinking or to see the bigger picture. Dr. Puente found that individuals from many areas of Mr. Estrada's life, such as family members, employers, and teachers, reported that Mr. Estrada required explicit direction most times and often had to be shown how to complete a simple task.

### 1)    Academic Skills Tests

In addition, Mr. Estrada's school records contain three years of testing results from the Texas Assessment of Academic Skills (hereafter "TAAS"), when Mr. Estrada was in seventh, eighth, and tenth grade. These results corroborate Dr. Puente's findings.

The TAAS tests students in three areas: Reading, Writing, and Mathematics. Mr. Estrada's available test results show that he failed *at least* one subtest each and every year for which we have records. In the seventh grade, Mr. Estrada did not meet the minimum requirements in either Writing or Mathematics, though he met minimum expectations in Reading.[33] In the eighth grade,

---

[32]    *Id.* at 13-16.
[33]    *See* Ex. 4, Educational Records from Spring Independent School District, Texas Assessment of Academic Skills (Bates Stamp 001953).

Mr. Estrada again met the minimum expectations in Reading, but did not pass the Mathematics section. He was absent for the writing section.[34] There are no further breakdowns of the scores on these two tests.

Mr. Estrada took his last TAAS test in the tenth grade. He did not pass the Reading or Mathematics sections of the test, but met the minimum expectations in the Writing section.[35] The records for this TAAS test further break down the Reading, Math, and Writing sections into subcategories and detail Mr. Estrada's performance in each one. Even in the Writing section, Mr. Estrada did not pass the subcategories of Sentence Construction and Use of Spelling, Capitalization, and Punctuation.[36] In Reading, Mr. Estrada failed to meet minimum standards in four out of six subcategories, including Supporting Ideas; Relationships and Outcomes; Inferences and Generalizations; and Point of View, Propaganda, and Fact and Nonfact.[37] In the Mathematics Section, Mr. Estrada did not pass eight of the thirteen subcategories.[38] More specifically, Mr. Estrada failed three of the five "Concept" subcategories: Algebraic/Mathematical Relations and Functions; Measurement Concepts; and Probability and Statistics.[39] Of the four "Operations" categories, Mr. Estrada did not pass Use of Multiplication to Solve Problems, and in fact did not get a single answer correct in that section.[40] Finally, Mr. Estrada failed all four of the "Problem Solving" math subcategories, including Problem Solving Using Estimation; Problem Solving Using Solution Strategies; Problem Solving Using Mathematical Representation; and Evaluation of the Reasonableness of a Solution.[41]

---

[34]    *Id.*
[35]    *See* Ex. 5, Northbrook High School Records, Texas Assessment of Academic Skills (Bates Stamp 1627).
[36]    *Id*.
[37]    Ex. 5, Northbrook High School Records, Texas Assessment of Academic Skills (Bates Stamp 1627).
[38]    *Id.*
[39]    *Id.*
[40]    *Id.*
[41]    *Id.*

Mr. Estrada's TAAS scores indicate substantial impairments in all three categories of writing, reading, and math, particularly in abilities related to conceptual thinking and problem-solving, and provide additional support that Mr. Estrada has significant limitations in intellectual functioning. Patricia Pace, Larry's first grade teacher—now a Spring Branch ISD administrator—, states, "[t]oday, if students do not pass [TAAS and TEAMS], they may not move forward to the next grade," indicating that Mr. Estrada would have been required to repeat the seventh grade and may never have advanced beyond it.[42]

### b)    Practical Domain

Dr. Puente determined that Mr. Estrada experiences significant limitations in the practical domain.[43] Family members reported that Mr. Estrada had difficulty engaging in age-appropriate skills such as tying shoes, buttoning shirts, and engaging in proper self-care. Mr. Estrada's clothes were often dirty and he did not know how to do laundry. Although Mr. Estrada was able to engage in limited tasks around the house, he was unable to maintain clean living spaces or prepare meals for himself. These limitations in everyday life skills impacted Mr. Estrada's ability to obtain and maintain a job; employers reported that Mr. Estrada's impairments often made it impossible for him to engage in or learn basic occupational skills independently and required assistance and substantial time to complete simple tasks. Mr. Estrada also struggled with sequencing and with switching from one task to another. Interviews with family and friends also confirm that Mr. Estrada struggled to get to school or work on time and that he often needed additional support in this area.

### c)    Social Domain

Finally, Dr. Puente indicates that Mr. Estrada shows significant deficits in the social domain.[44] Mr. Estrada was frequently described as a follower and as someone who was easily manipulated. Mr.

---

[42]      Ex. 6, Pace, Patricia Aff. ¶ 12.
[43]      Ex. 1, Puente Report, at 17-18.
[44]      *Id.*, at 16-17.

Estrada sought guidance from others as a young child and as he grew older. Given that Mr. Estrada was eager for the acceptance of others, he was unable to recognize a person's true intentions and was not able to distinguish between a good friend and a bad friend. Mr. Estrada did not maintain meaningful relationships and struggled to interact with friends, teachers, and family members. These limitations contributed to Mr. Estrada's gullibility, victimizations, and naivete through childhood and later in life. This set of characteristics made Mr. Estrada especially susceptible to the demands of others, including members of his family, such as his cousins, Catalino and Presiliano Yanez, who viewed Mr. Estrada as an easy mark for carrying out their illegal plans.

### 3.    Mr. Estrada's disability originated during the developmental period.

Developmental origin is the third criterion for a valid diagnosis of ID.[45] The AAIDD explicitly states that the disability must originate before age 18, whereas the DSM-5 uses the slightly more general definition of the "onset of intellectual and adaptive deficits during the developmental period."[46]

### a)    Evidence of Developmental Onset

There is ample evidence that Mr. Estrada's intellectual and adaptive impairments originated before age 18.[47] Indeed, many of his intellectual, social, and practical deficits were apparent in early childhood. This evidence, which is thoroughly presented in Dr. Puente's report, is documented in school records from elementary, middle, and high school, in child protective services and medical records, and in affidavits with Mr. Estrada's teachers, family members, and peers.

---

[45]     *See* DSM-5, at 33; AAIDD Manual, at 5, 58-62.

[46]     *Id.*

[47]     Ex. 1, Puente Report, at 20; *see id.*, at 9-13 (describing when collateral sources knew Mr. Estrada).

### b) Risk Factors for Intellectual Disability

The many risk factors for intellectual disability are vividly present throughout Mr. Estrada's developmental period. Impaired intellectual development is known to correlate with many biomedical, social, behavioral and educational factors that exist in Mr. Estrada's life history. The violence that was committed against him as a young child through adolescence, his mother's abandonment and neglect, the family's poverty, the frequent moves that made consistent schooling virtually impossible, and the general absence of effective support all contributed to or increased the risk that Mr. Estrada would develop intellectual disability.

### C. Conclusion

Mr. Estrada is a person with intellectual disability. His IQ falls within the range indicating significant limitations in intellectual functioning, including a Full Scale IQ score of 74, a short-form WAIS-R score of 76, and numerous TDCJ IQ reports noting that his IQ is under 73.

Mr. Estrada also has significant limitations in all three domains of adaptive functioning: conceptual, social, and practical. In the conceptual domain, records and interviews with teachers demonstrate that Mr. Estrada struggled in school and sought out help from other students to complete his assignments. Even so, Mr. Estrada failed several classes and had consistently low grades in English. On two occasions, the school recommended intervention, including tutoring, but it is unclear whether Mr. Estrada ever received additional support. Two teachers admitted to passing Mr. Estrada because he tried hard. Mr. Estrada also failed TAAS testing multiple times, and performed at extremely low levels in subtests of problem-solving and conceptual thinking.

In the social domain, Mr. Estrada had limited abilities in nearly every subcategory. Mr. Estrada struggled to make friends, never had a girlfriend, and did not understand how to develop intimate relationships. Mr. Estrada had extremely low self-esteem and was frequently victimized by others who perceived him as gullible and naïve. Although Mr. Estrada was eager to please and

followed others' orders to an extreme extent, he did not understand concepts of rule-breaking and punishment. His impaired social judgment and inability to adapt to shifting circumstances in social situations also inhibited his social-problem solving.

In the practical domain, Mr. Estrada could perform very simple tasks if someone showed him how; however, without support Mr. Estrada could not perform many activities of daily living. Mr. Estrada could not cook nutritious meals and frequently could not keep himself or his clothes clean. While Mr. Estrada could work in jobs involving simple, menial tasks, such as busing a table or filling up water glasses, he could not work a cash register or prepare food. Mr. Estrada never became adept at driving or obtained a driver's license. He also did not know how to take the bus, so he walked or rode his bike. Mr. Estrada was also unable to make appropriate decisions concerning his health and safety.

Finally, Mr. Estrada's impairments in intellectual and adaptive functioning originated before he was 18. Many of these impairments are apparent from early childhood. Although there is no single cause for Mr. Estrada's disability, many prenatal, perinatal, and postnatal risk factors for mild ID apply to Mr. Estrada.

Under *Atkins*, the Eighth Amendment bars Mr. Estrada's execution.

## IV.   MR. ESTRADA'S DEATH SENTENCE VIOLATES DUE PROCESS BECAUSE THE STATE WITHHELD MATERIAL EVIDENCE IN VIOLATION OF *BRADY*.

### A.   Standard for Assessing *Brady* Claims

The prosecutor in a criminal case "is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935);

*see also Armstrong v. State*, 897 S.W.2d 361, 371 (Tex. Crim. App. 1995) ("'Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly.'") (citation omitted). Thus, although a district attorney "may prosecute with earnestness and vigor," it "is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Berger*, 295 U.S. at 88.

To give content to that overarching principle, the Supreme Court has long held that a defendant's due process rights are violated where the government withholds exculpatory or impeachment evidence that is material to either guilt or punishment. *See Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the United States Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Subsequent decisions have abandoned the prerequisite of a defense request for exculpatory evidence before an accused may benefit from the Court's decision in *Brady*. *United States v. Bagley*, 473 U.S. 667, 682 (1985). Moreover, the Court has rejected any distinction between impeachment and exculpatory evidence for *Brady* purposes. *Id.* at 677; *Giglio v. United States*, 405 U.S. 150, 154 (1972).

Under *Brady* and its progeny, a proceeding is rendered fundamentally unfair if: (1) the prosecution suppressed favorable evidence, and, (2) the evidence was material to either guilt or punishment. *Brady*, 373 U.S. at 87; *see Kyles v. Whitley*, 514 U.S. 419, 432 (1995); *Bagley*, 473 U.S. at 683; *Blackmon v. Scott*, 22 F.3d 560, 564 (5th Cir), *cert. denied*, 513 U.S. 1060 (1994); *see also Ex Parte Miles*, 359 S.W.3d 647, 665 (Tex. Crim. App. 2012) ("To establish a claim under *Brady*, a habeas applicant must demonstrate that (1) the State failed to disclose evidence, regardless

of the prosecution's good or bad faith; (2) the withheld evidence is favorable to him; [and] (3) the evidence is material, that is, there is a reasonable probability that had the evidence been disclosed, the outcome of the trial would have been different.").

Evidence is material "if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Kyles*, 514 U.S. at 434; *Bagley*, 473 U.S. at 682; *Blackmon*, 22 F.3d at 564. A reasonable probability is a probability "sufficient to undermine confidence in the outcome." *Hinton v. Alabama*, 571 U.S. 263, 275 (2014) (citation omitted).

*Kyles* clarified four significant aspects of materiality analysis under *Brady*. First, to demonstrate materiality, Mr. Estrada is not required to demonstrate by a preponderance of the evidence that the suppressed evidence, if known to the defense, would have ultimately resulted in an acquittal or a life sentence. *Kyles*, 514 U.S. at 434. The inquiry is more properly whether the suppressed evidence undermines confidence in the jury's decision. *Id.*

Second, the test for materiality is not a "sufficiency of the evidence" test. *Id.* Mr. Estrada need not show that the favorable evidence would weigh so heavily against the inculpatory evidence that "there would not have been enough left to convict [or return a sentence of death]." *Id.* at 434-35. As long as the favorable evidence withheld "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict," the evidence is material and Mr. Estrada's due process rights violated. *Id.* at 435.

Third, harmless error analysis is not applicable to *Brady* violations. *Id.* And, fourth, "suppressed evidence [must be] considered collectively, not item by item." *Id.*, at 436.

B.      **Evidence That Mr. Estrada Did Not Kill the Decedent Would Have Been Material to His Sentencing**

During Mr. Estrada's trial, the jury heard evidence that Mr. Estrada and Mr. Mauro Ortiz walked into an A-1 Food Mart, each carrying a handgun. One of the weapons was a 9 mm, the other was the murder weapon—a .380 caliber handgun. From its opening statement, the State argued that "the gun this defendant [Mr. Estrada] had was used to fire [the] fatal wounds [sic]" (Trial Tr. Vol. 19, at 29:8–9), but the evidence presented by the State was unclear. In truth, the State had in its possession evidence that would have clearly shown the opposite was true. This fact—that Mr. Estrada did not have the murder weapon—would have been material to the jury at sentencing.

Although none of the witnesses saw who killed the decedent, the medical examiner's report and testimony was undisputed that the decedent was killed by a .380 caliber round to the back. The decedent had three wounds.  (*See* Trial Tr. Vol. 20, at 19:5-23:25.)  Two were caused by bullets from the .380 that were found in the decedent's body.  (Trial Tr. Vol. 20, at 19:5-15, 20:4-21:6, 43:15-18.)  One of them was the fatal wound to the back.  (Trial Tr. Vol. 20, at 22:17-23:6.) The third round passed straight through the decedent's lower leg, about eight inches above the ankle, without striking bone. (Trial Tr. Vol. 20, at 23:7-25.)

The evidence on which the State based its theory that Mr. Estrada was the shooter was weak. One witness, Mr. Menaf Khudari, said that Mr. Estrada had the smaller weapon of the two men. (Trial Tr. Vol. 19, at 109:2-9.) A different witness, HPD Officer William Cates, stated that "most" .380 caliber weapons are smaller than 9 mm ones, but that it "[d]epends on what brand it is." (Trial Tr. Vol. 19, at 42:10-24.) The State's firearms expert, Mr. C.E. Anderson, was also asked about the specific brands of firearms that could have fired the cartridges found at the scene. (Trial Tr. Vol. 20, at 45:11-16.) He testified that "[t]ypically the 9 millimeter is a larger

manufactured weapon," but "[t]here are some that are not." (*Id.* at 45:17-19.) This testimony was barely probative of the question, "Who had which gun?" Unfortunately, the jury was given nothing more substantial to rely on.

There was evidence that the masked gunman, Mr. Ortiz,[48] fired a bullet into a television monitor. The police recovered that bullet and submitted it to the firearms lab. Had the jury been able to determine the caliber of that bullet, it could have determined which of the offenders had the murder weapon. The trial evidence, however, did not permit the jury to answer this question.

The State's firearms expert, Mr. Anderson, did not testify which bullet was found in the television monitor. The State's attorney, Kelly Seigler, asked Mr. Anderson, "Did you also examine in State's Exhibit Number 28, EB-l and 2[49] submitted to you from the scene also, recovered from the television monitor?" (Trial Tr. Vol. 20, at 45:23-25.) Mr. Anderson's answer was nonresponsive. He said, "When I run this, I only had the one and later on I run it, guessed it, but I don't have a list in here. You may have the last report. I don't." (*Id.* at 46:1-4.) Ms. Seigler did not indicate that she had any other reports. (*See id.* at 46:5-6 ("Looking at **this** copy of the report where it reflects EB-1—") (emphasis added).)

The jury heard testimony that EB-1 was a 9 mm round, and that EB-2 and the two bullets recovered from the decedent's body at the morgue ("EB-6" and "EB-7") were all .380 caliber rounds. (*Id.* at 42:14-43:11, 46:5-19.) The jury also heard testimony that all three .380 caliber rounds were fired from the same weapon. (*Id.* at 46:20-47:20.) But the jury never heard evidence indicating whether EB-1 or EB-2 was the bullet recovered from the television. Rather, Officer Cates, the crime scene investigator who recovered the bullets, used his own numbering scheme to identify the evidence he collected at the scene. (Trial Tr. Vol. 19, at 50:17-52:11, 56:9-17.)

---

[48]     Mr. Estrada entered the store without a mask.
[49]     "EB" stands for "evidence bullet." (Trial Tr. Vol. 20, at 42:20-21.)

At the close of evidence, the jury still did not know which gun Mr. Estrada had during the incident. The jurors submitted a single question to the judge during deliberations at the punishment stage, identifying as the "Statement in dispute: Caliber of the bullet found in the television." (Trial Tr. Vol. 24, at 49:1-2.) The Court read the testimony from the firearms expert back to the jury (*see id.* at 49:5-50:3), but that testimony was inconclusive, as shown above.

Other evidence that was in the State's possession shows that EB-2—a .380 caliber bullet fragment—was the evidence recovered from the television, but only when several documents are considered in tandem.

First, Officer Cates submitted a supplement to the HPD offense report for the incident on February 22, 1997, describing his actions and observations the previous day during his investigation of the crime scene and at the morgue.[50] Officer Cates described "recover[ing] a bullet fragment from the interior of the tube" of the television monitor at the crime scene.[51] He also reported that "five cartridge cases, [a] fired bullet and [a] fired bullet fragment [were] tagged in the HPD firearms lab evidence lock box located in the crime scene unit office."[52]

Second, Mr. Anderson submitted a supplement to the offense report on March 21, 1997, with his conclusions.[53] Mr. Anderson lists among the "items submitted to the firearms laboratory," a "fired jacketed lead bullet (EB-1)," one "fired bullet jacket (EB-2)," two "fired bullet jacket fragments (EB-3–4)," and one "lead fragment (EB-5)," all received on February 24 from the "locked evidence box CSU office."[54] He also lists two "fired jacketed hollow point bullets (EB-6–

---

[50]    Ex. 7, HPD Report of Officer Cates (COH/ESTRADA 4 00134-39).
[51]    *Id.* at 136.
[52]    *Id.* at 138.
[53]    Ex. 8, HPD Supplement Report from C.E. Anderson (COH/ESTRADA 4 00163-65).
[54]    *Id.* at 163-64.

7).”[55] Mr. Anderson explains that “the one (1) fired jacketed lead bullet (EB-1) is a 9MM” and “the two (2) fired jacketed hollow point lead bullets (EB-6–7) and one (1) [fi]red bullet jacket (EB-2) were fired in the same .380 auto.”[56] The items Mr. Anderson described as “fragments” (EB-3–5) “contain[ed] insufficient definite and consistent individual characteristics to effect an identification.”[57]

Without access to the firearms laboratory file, it would be reasonable for an attorney reviewing these records while preparing to defend Mr. Estrada at trial to conclude that the “fragment” Officer Cates recovered from the television was one of the “fragments” that Mr. Anderson could not identify. But this conclusion would be wrong.

A “firearms and tool mark submission form” in the HPD firearms laboratory file shows that “W.C. Cates” submitted five fired cartridge cases, one fired bullet, and—in a blank for “other firearm evidence”—a “bullet fragment.”[58] At the bottom, under the heading “for laboratory use only,” this form indicates that the evidence submitted was assigned labels “EB 1–2” and “ECC 1–5.”[59] Unlike Officer Cates, the firearms laboratory did not describe either EB-1 or EB-2 as a “fragment,” as shown by a “firearms section work sheet” in the HPD firearms laboratory file.[60] EB-1 is described as “jacketed lead,” and EB-2 is described as just a “jacket.”[61] In contrast, three other bullets (EB-3, EB-4, and EB-5) are described as “fragment” or “frag,”[62] despite being described on their respective submission forms as “fired bullet(s).”[63] Nevertheless, the firearms

---

[55]     *Id.* at 164.
[56]     *Id.* at 164-65.
[57]     *Id.* at 165.
[58]     Ex. 9, HPD Firearms Laboratory File (COH/ESTRADA 5 00001-00021) at 2.
[59]     *Id.*
[60]     *See id.* at COH/ESTRADA 5 00007.
[61]     *Id.*
[62]     *Id.*
[63]     *See id.* at COH/ESTRADA 5 00003.

worksheet shows which of the fired rounds—EB-1 or EB-2—is the "fragment" described by Officer Cates. EB-2 is just a "jacket" without lead, in contrast to the "jacketed lead" of EB-1, and the reported weight of EB-2 is just under 10% of the weight of EB-1.[64]  And the notations near the bottom of the worksheet read, in part, "EB-1 9MM," "EB-2 -380," "EB-6-M 380," and "EB-7-M 380,"[65] confirming Mr. Anderson's conclusions in the offense report.

Significantly, the firearms laboratory file also would not have been enough on its own to clarify which bullet struck the television. Without the offense report, there was no way to know that Officer Cates recovered a so-called "bullet fragment" from the television.[66]  Also, prior to hearing the trial testimony,[67] the sworn witness statement of Menaf Khudari was necessary to identify the masked robber as the one who fired the shot into the television.[68]

Accordingly, only if Mr. Estrada's attorneys had access to the firearms laboratory file, the offense report, and the Mr. Khudari's witness statement *simultaneously* could they have prepared a case against execution by showing that Mr. Estrada never killed anyone. The eyewitness testimony showed that Mr. Ortiz fired the round into the television during the incident. Taken together, the offense report and the documents in the firearms laboratory file make it possible to deduce that this round fired by Mr. Ortiz is the same round that Officer Cates retrieved and which the HPD firearms laboratory labeled EB-2. All the evidence, both at trial and in the HPD files, agrees that EB-2 was a .380 caliber round fired from the same .380 handgun that killed the decedent. This means Mr. Ortiz wielded the murder weapon, and Mr. Estrada did not.

[64]    *See id.* at COH/ESTRADA 5 00007.
[65]    *Id.*
[66]    Ex. 7 at COH/ESTRADA 4 00136.
[67]    Another witness at trial, Mr. Martin Low Cook, testified that he witnessed the masked robber shoot the television (Trial Tr. Vol. 19, at 207:4-7), but his statement to police did not mention this fact.
[68]    *See* Ex. 10, HPD Witness Statements (COH/ESTRADA 4 00364-73) at 366 (attesting that the "second guy," who wore a mask, "shot at something tow[a]rds me" that Mr. Khudari later figured out was the store "video monitor").

In a statement to police after his arrest in San Antonio, Mr. Ortiz corroborated that Mr. Estrada had the 9 mm handgun, twice stating that Mr. Estrada "had a nine" that Mr. Ortiz had given to him.[69] Thus, not only did the police department's own records support Mr. Estrada's version of events, Mr. Ortiz admitted arming Mr. Estrada with a 9 mm for purposes of committing armed robbery. Even if the credibility of Mr. Ortiz's statement had been attacked, Mr. Ortiz had nothing to gain by this admission. This evidence would have further strengthened Mr. Estrada's defense at sentencing.

### C.   This Favorable Evidence Was Withheld and Was Unavailable to Estrada's Original Habeas Counsel

Mr. Estrada's trial counsel, Mr. Guerinot, did not receive copies of the firearms laboratory records. At the time, the Harris County District Attorney had an "open file" policy, and both the prosecution and Mr. Guerinot relied on this policy as a means for complying with *Brady*. But the District Attorney's file for the case against Mr. Estrada (which present counsel has obtained) did not contain the documents from the firearms laboratory.

Mr. Estrada's present counsel only obtained a copy of the complete firearms laboratory file after making requests to the City of Houston under the Texas Public Information Act (TPIA). Even then, the City of Houston did not disclose the laboratory file until after counsel filed a mandamus action under the TPIA on Mr. Estrada's behalf to compel disclosure of information. Furthermore, it was not until October 2011 that the City of Houston finally provided an affidavit claiming to have completely disclosed all requested records (including the firearms laboratory file), except those being withheld on a claimed exception under the TPIA. (Still more documents were obtained following summary judgment in that case, and some documents are still being withheld as of this filing.)

---

[69]     Ex. 11, Police Interview with Mauro Ortiz (COH/ESTRADA 4 00378-94) at 384.

Mr. Guerinot also did not receive a copy of the sworn statement of Mr. Ortiz.[70] That, too, was missing from the District Attorney's file in Mr. Estrada's case, and Mr. Estrada's present counsel only obtained it as federal habeas counsel by specifically requesting the District Attorney's files from the prosecution of Mr. Ortiz.

Because counsel needed to pursue the *Brady* evidence through extraordinary measures, including litigation under the TPIA against the City of Houston, the present *Brady* claim could not reasonably have been raised at the time of Mr. Estrada's prior habeas application.

### D.    Conclusion

The evidence that the State withheld would have enabled Mr. Estrada to demonstrate he did not have the murder weapon, a question left open in the jury's mind at the close of sentencing. The jury's question to the Court shows this fact was material to the jury's deliberations at sentencing. Accordingly, Mr. Estrada's death sentence violated his constitutional rights, and he is entitled to a new sentencing hearing.

## V.    PRAYER FOR RELIEF

In view of the foregoing, applicant Larry Estrada respectfully requests that this Honorable Court:

1.    Enter an order finding that each claim presented in this application satisfies the requirements of Tex. Code Crim. Proc. art 11.071 § 5, and remanding the case to the convicting court for further proceedings on the merits;

2.    Grant relief from his unconstitutional sentence of death; and

3.    Grant any other relief which law and justice require in this matter.

---

[70] *See* Ex. 12, Guerinot, Gerard W. Aff., ¶¶ 3, 6.

Dated: December 12, 2019                 MAYER BROWN LLP

By: /s/ Charles Kelley
    Charles Kelley
    Attorney-in-charge
    Texas Bar No. 11199580
    MAYER BROWN LLP
    700 Louisiana Street, Suite 3400
    Houston, Texas 77002-2730
    Telephone: (713) 238-2634
    Email: ckelley@mayerbrown.com

    OF COUNSEL:
    Quinncy McNeal
    Texas Bar No.: 24074690
    Email:  qmcneal@mayerbrown.com

    Christopher Watts
    Texas Bar No.: 2408861
    MAYER BROWN LLP
    700 Louisiana Street, Suite 3400
    Houston, Texas 77002-2730
    Telephone: (713) 238-3000
    Email:  cwatts@mayerbrown.com

    Kyle Friesen
    Texas Bar No.: 24061954
    SHOOK HARDY & BACON
    600 Travis Street, Suite 3400
    Houston, Texas 77002
    Telephone: (713) 227-8008
    Email:  kfriesen@shb.com

    Marc Kadish
    Maria C. Critelli
    MAYER BROWN LLP
    71 South Wacker Drive
    Chicago, IL 60606
    Telephone: (312) 701-8747
    Email:  mkadish@mayerbrown.com
            mcritelli@mayerbrown.com

Jared Tyler
Texas Bar No.: 24042073
TYLER LAW FIRM, PLLC
P.O. Box 764
Houston, Texas 77001
Telephone: (713) 861-4004
Email:   jptyler@tylerlawfirm.org

STATE OF TEXAS     §
          §
HARRIS COUNTY    §

## AFFIDAVIT OF VERIFICATION
## PURSUANT TO TEX. CODE CRIM. PROC. ARTICLES 11.12 AND 11.14

BEFORE ME, the undersigned authority, on this day personally appeared Kyle E. Friesen, a person known unto me and who, upon being duly sworn by me, testified as follows:

1.   I am a member of the State Bar of Texas.

2.   I am the duly authorized attorney for Larry Edgar Estrada, having the authority to prepare and to verify Mr. Estrada's Subsequent Application for Post-Conviction Writ of Habeas Corpus as petitioner on his behalf.

3.   Pursuant to Article 11.14(5) of the Texas Code of Criminal Procedure, I hereby swear that the allegations of the application are true, according to my belief.

_____
Kyle E. Friesen

SUBSCRIBED AND SWORN on this 12th day of December, 2019.

SUSAN SWIHART
2945460
NOTARY PUBLIC, STATE OF TEXAS
MY COMMISSION EXPIRES
AUGUST 29, 2020

_____
NOTARY PUBLIC

My Commission Expires:

8/29/20